# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

MARIA CANTU,

      Plaintiff,

v.                                             Civil Action 2:17-cv-1123
                                               Magistrate Judge Jolson

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

## OPINION AND ORDER

Plaintiff Maria Cantu filed this action seeking review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits ("DIB"). For the reasons that follow, Plaintiff's Statement of Errors (Doc. 12) is **OVERRULED** and the Commissioner's decision is **AFFIRMED**.

## I. BACKGROUND

### A. Prior Proceedings

Plaintiff filed for DIB on April 2, 2014, alleging a disability onset date of February 1, 2012. (*See* Tr. 67, PAGEID #: 114). Earning records show that Plaintiff acquired sufficient quarters of coverage to remain insured through December 31, 2012. (*Id.*). After Plaintiff's applications were denied initially (Tr. 84–86, PAGEID #: 131–33) and upon reconsideration (Tr. 94–95, PAGEID #: 141–42), Plaintiff filed a Request for Hearing by an Administrative Law Judge (Tr. 102, PAGEID #: 149). Administrative Law Judge Jeffrey Hartranft (the "ALJ") held a hearing on August 25, 2016 (Tr. 44–66, PAGEID #: 91–113), after which he denied benefits in a written decision on November 2, 2016 (Tr. 21–39, PAGEID #: 68–86). The Appeals Council denied review on October 23, 2017, making the ALJ's decision the final decision of the

Commissioner. (Tr. 1–3, PAGEID #: 48–50).

Plaintiff filed this case on December 21, 2017 (Doc. 1-2), and the Commissioner filed the administrative record on March 5, 2018 (Doc. 7). Plaintiff filed a Statement of Specific Errors (Doc. 12), the Commissioner responded (Doc. 13), and Plaintiff filed a Reply (Doc. 14).

Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, and upon consent of the parties, this case was referred to the undersigned to conduct all proceedings and order the entry of final judgment. (Doc. 9).

### B. Relevant Medical Background

*1. Prior to the Date Last Insured*

Plaintiff suffered a fractured right radius and distal ulna—better known as a fractured wrist—on January 14, 2009. (Tr. 244, PAGEID #: 291). Treatment notes from Plaintiff's primary care physician Dr. Neel Raya reference the fact that she underwent hand surgery on three separate occasions (*see* Tr. 368, PAGEID #: 415), but no dates or further information were present in the medical record.

On June 21, 2011, Plaintiff was referred by Dr. Raya to Dr. Matthew Kauffman for pain in her right shoulder. (Tr. 273, PAGEID #: 320). Plaintiff stated that her pain was worse when she attempted overhead activities, laid on her right side, or reached behind her back. (*Id.*). An examination by Dr. Kauffman revealed full range of motion in her elbows, wrists, and hands with no pain; no detectable grip strength weakness; pain on range of motion in the right shoulder during abduction and forward flexion; no detectable atrophy of the deltoid muscle; and some mild weakness with her arm abducted at 90 degrees. (Tr. 273–74, PAGEID #: 320–21). Dr. Kauffman also reviewed x-rays taken of Plaintiff's right shoulder the previous week, and diagnosed mild AC arthritis. (Tr. 274, PAGEID #: 321; *see also* Tr. 247, PAGEID #: 294).

Based on his examination, Dr. Kauffman referred Plaintiff to get an MRI. (*Id.*).

Plaintiff's right-shoulder MRI revealed "a large tear of the supraspinatus component of the rotator cuff, with proximal tendon retraction, and atrophy with fatty infiltration of the supraspinatus muscle." (Tr. 348, PAGEID #: 295). Plaintiff elected to treat her torn rotator cuff surgically (Tr. 271, PAGEID #: 318), and underwent surgery with Dr. Kauffman on July 22, 2011. (Tr. 255, PAGEID #: 302). Plaintiff's operative notes state "[t]he rotator cuff itself was . . . significantly retracted mostly along the supraspinatus region" and "the supraspinatus itself [] ha[d] significant fraying with whatever fibers were noted to be remaining." (Tr. 256, PAGEID #: 303). Further, the notes state that "[a] chance of operative stabilization of the rotator cuff was deemed to be poor." (Tr. 256–57, PAGEID #: 303–04).

Plaintiff was seen by Dr. Kauffman again on August 2, 2011, for a ten-day post-operative follow-up appointment. (Tr. 267, PAGEID #: 314). At that time, Plaintiff reported that she "ha[d] been doing quite well with still an occasional soreness and pain to her right shoulder but otherwise ha[d] been progressing quite well and ha[d] been tolerating her physical therapy quite well." (*Id.*). At another follow-up appointment on September 13, 2011, Plaintiff stated she "ha[d] been doing great" and her pain was "well controlled." (Tr. 265, PAGEID #: 312). Plaintiff noted that she still had "some difficulty with overhead lifting" but was doing much better with her activities of daily living. (*Id.*). Treatment notes also state that Plaintiff had full active range of motion in both forward flexion and abduction, as well as 78 degrees of external rotation to her right shoulder. (*Id.*).

At another appointment with Dr. Kauffman on December 6, 2011, Plaintiff stated she "ha[d] been doing great with limited difficulty with increased activity over the last several months." (Tr. 263, PAGEID #: 310). Further, Plaintiff said she had returned to her normal

3

activities "with little to no other difficulty." (*Id.*). Her physical examination revealed full active range of motion to her right shoulder with no tenderness to palpation over her cervical spine or shoulder regions and she had "5 out of 5 strength in all motions." (*Id.*). Dr. Kauffman noted that "[w]ith [Plaintiff] progressing as well as she has, we will have her continue with her activities as tolerated . . . and we will plan on seeing her back on an as needed basis." (*Id.*).

### *2. After the Date Last Insured*

On May 23, 2014, Dr. Raya wrote the following letter to the Social Security Administration: "This lady with multiple medical problems is completely disables [sic] due to her hand deformity and rt-shoulder deformity which she has had previous surgery." (Tr. 417, PAGEID #: 464). No other information was provided.

On October 29, 2014, Plaintiff again presented to Dr. Kauffman complaining of right shoulder pain. (Tr. 387, PAGEID #: 434). Treatment notes state that "[s]he was previously seen almost three years ago for a followup of this same shoulder which she did have both an MRI as well as a right shoulder arthroscopy showing a massive irreparable right rotator cuff tear . . . [and] a subacromial decompression[.]" (*Id.*). Plaintiff explained that she returned to Dr. Kauffman because she was experiencing continuing pain, limited range of motion, popping, clicking, and snapping of the shoulder. (*Id.*). Plaintiff reported undergoing no additional treatment since her surgery, with the exception of taking over the counter pain medication. (*Id.*).

A physical examination revealed full range of motion and no pain in the elbows, wrists, and hands; no detectable grip strength weakness; marked pain on range of motion in the right shoulder, slight detectable atrophy in the deltoid muscle, dramatic weakness on abduction of the right shoulder against resistance, with a positive two-finger test noted, and an active range of motion between 0 to 95 degrees of forward flexion and approximately 0 to 80 degrees of

4

abduction. (Tr. 387–88, PAGEID #: 434–35). Dr. Kauffman administered a Cortisone injection, prescribed "a course of outpatient physical therapy for further strengthening and range of motion[,]" and prescribed Tylenol and Codeine for pain. (Tr. 388, PAGEID #: 435).

Plaintiff returned to Dr. Kauffman on November 13, 2014 for a follow-up appointment. (Tr. 385, PAGEID #: 432). Plaintiff said that she experienced little to no improvement after taking the Tylenol and Codeine and, although ice packs help occasionally, she stated they do not provide any lasting relief. (*Id.*). Plaintiff reported that she still cooked and cleaned at home, even with her increased shoulder pain, but she had not been able to do as much as of late. (*Id.*). Accordingly, Dr. Kauffman ordered new x-rays. (Tr. 386, PAGEID #: 433). A November 2014 x-ray revealed no fracture, dislocation, or other osseous abnormality, but showed superior migration of the humerus. (Tr. 290, 384, PAGEID #: 337, 431).

At another follow-up on December 9, 2014, Dr. Kauffman noted that Plaintiff was "doing significantly better since the initial treatment given to her" and that she was taking Ibuprofen and rated her pain as a 2 to 3 out of 10. (Tr. 383, PAGEID #: 430). Dr. Kauffman administered another Cortisone shot, which he noted Plaintiff tolerated well. (Tr. 384, PAGEID #: 431). Plaintiff reported at a May 21, 2015 appointment that she "ha[d] been doing well after her last Cortisone injection[,]" but her pain had gradually worsened over the last one to two months. (Tr. 381, PAGEID #: 428). Dr. Kauffman administered a third Cortisone injection and opined that with Plaintiff "progressing as well as she has and with her pain controlled as it is and with her tolerating her Cortisone injection quite well we will [] have her restart her course of Ibuprofen for further pain control" and see Plaintiff again in three months. (Tr. 382, PAGEID #: 429).

On August 25, 2015, Plaintiff reported "mild improvement" from the Cortisone injection in May and reported taking Ibuprofen for pain. (Tr. 379, PAGEID #: 426). Dr. Kauffman

5

administered another Cortisone injection, ordered another x-ray, and prescribed physical therapy "for stretching, strengthening and range of motion exercises." (Tr. 380, PAGEID #: 427). The updated x-ray showed no acute osseous variation and only mild acromioclavicular joint osteoarthritis. (Tr. 375–76, PAGEID #: 422–23).

At a final appointment with Dr. Kauffman on March 8, 2016, Plaintiff stated that although she was experiencing "gradually worsening pain," the prescription strength Ibuprofen she was taking had "helped her quite a bit[.]" (Tr. 377, PAGEID #: 424).

### C. Relevant Testimony at the Administrative Hearing

It is worth noting as an initial matter that although an interpreter was present at the hearing, it appears that Plaintiff answered the questions without any interpreting services. (Tr. 46–48, PAGEID #: 93–95).

Plaintiff testified that she last worked in 2007 in a school cafeteria preparing and serving food. (Tr. 50, PAGEID #: 97). While working in the cafeteria, Plaintiff stated that she would carry fifty to sixty pounds, and ultimately stopped working because she moved, not because of a physical impairment. (Tr. 51, PAGEID #: 98).

Plaintiff testified that she underwent right shoulder surgery in 2011 (*id.*), and broke her wrist twice five or six years ago (Tr. 56, PAGEID #: 103). Despite her shoulder surgery, Plaintiff testified that her shoulder pain remained. (Tr. 59–60, PAGEID #: 106–07). The following exchange occurred after the ALJ asked Plaintiff what kind of problems she was having in 2012:

> A: My shoulder, even when I cook it hurt when started doing the – I not do the same stuff as before.
>
> Q: Okay, you had problems with your shoulder?
>
> A: Yes.

6

Q: So, you couldn't stir?

A: It hurt.

Q: It hurt?

A: Yeah.

Q: Back in 2012, did you have any problems – were you, did you have restrictions – did you have problems moving your shoulder?

A: Not much.

Q: Not much?

A: No, when it started I can't lift to even wash my hair.

Q: Back in 2012 you could wash your hair?

A: It started, the problems, because it kept pulling my arm.

Atty: I think she might be confused, Your Honor.

ALJ: Yeah.

Q: Back in 2012, were you able to wash your hair?

A: Sometimes, yes.

(Tr. 53–54, PAGEID #: 100–01). Plaintiff also testified that in 2012 she could carry less than twenty pounds. (Tr. 54, PAGEID #: 102).

Plaintiff testified that she has trouble raising her arm and treats her pain with Cortisone shots and pain pills.[1] (Tr. 60–61, PAGEID #: 107–08). Although she tried physical therapy, Plaintiff stated that made her pain worse. (Tr. 62, PAGEID #: 109). Plaintiff explained that her pain is exacerbated when she moves her arm and "[i]t hurts a lot to pick up stuff." (Tr. 61, PAGEID #: 108). Finally, Plaintiff testified that she chose February 2012 as her alleged onset

---

[1] Although the ALJ made clear that he was interested in Plaintiff's symptoms in 2012, based on the medical record, this testimony appears to relate to Plaintiff's treatment in 2015 and 2016, not 2012.

7

date because that is "when [she] started having a lot of pain," and stated "I can't do the stuff, can't do it." (Tr. 58–59, PAGEID #: 105–06).

Vocational Expert Dr. Walter B. Walsh ("the VE") also testified at the hearing. The VE testified that a hypothetical individual capable of working at the medium exertion level, with the caveat that she could only occasionally reach overhead with her right arm, would be able to perform Plaintiff's past work as a cook's helper. (Tr. 63, PAGEID #: 110).

### D. The ALJ's Decision

The ALJ found that Plaintiff had not engaged in substantial gainful employment during the relevant time period and found Plaintiff met the insured status requirements of the Social Security Act through December 31, 2012. (Tr. 29, PAGEID #: 76). The ALJ noted that for purposes of DIB, Plaintiff "must establish disability prior to the expiration of insured status." (*Id.*). Further, the ALJ explained that "[e]vidence of new developments in a claimant's impairments after the expiration of insured status is generally not relevant," and may only be examined when it is established that the impairment existed continuously and in the same degree from the date last insured. (*Id.* (citing *Bagby v. Harris*, 850 F.3d 836 (6th Cir. 1981)). Because "[t]here [was] no evidence that the claimant [was] as limited prior to the expiration of insured status as she might be since that time[,]" the ALJ held that "evidence from after the expiration of insured status [was] not relevant with respect to the period from the alleged onset date of disability through the date last insured." (*Id.*).

With this in mind, the ALJ determined that from the alleged onset date of disability through the date last insured ("DLI"), Plaintiff suffered from the severe impairments of right shoulder rotator cuff tear and subacromial impingement with bursitis. (Tr. 29–30, PAGEID #: 76–77). However, the ALJ held that none of the impairments alone or in combination met or

equaled a listed impairment. (Tr. 31, PAGEID #: 78). Specifically, the ALJ stated Plaintiff failed to meet Listing 1.02B because there was "no evidence documenting involvement of a major peripheral joint in each upper extremity from the alleged onset date of disability through the date last insured." (*Id.*).

As to Plaintiff's RFC, the ALJ stated that Plaintiff had the residual functional capacity ("RFC") to "perform medium work as defined in 20 CFR 404.1567(c)," but "overhead reaching with the right upper extremity [was] limited to no more than occasionally." (*Id.*). In making this determination, the ALJ opined:

> The record does not document any complaints of right shoulder pain or treatment for the claimant's right shoulder impairments from the alleged onset date of disability through the date last insured. The claimant did allege occasional right shoulder pain and soreness within two weeks of her July 2011 surgical procedure (Exhibit 7F/5). The claimant also complained of some difficulties with overhead lifting in September 2011 (Exhibit 7F/3).
>
> . . .
>
> There is no evidence of additional exertional limitations and restrictions attributable to the claimant's physical impairments and related symptoms, which are generally stable, tolerable and well controlled from the alleged onset date of disability through the date last insured. The record does not document any complaints of right shoulder pain or treatment for the claimant's right shoulder impairments from the alleged onset date of disability through the date last insured.

(Tr. 32, PAGEID #: 79). In support, the ALJ noted, *inter alia*, that Plaintiff had no pain on range of motion in the elbows, hands and wrists (*id.*); had full range of motion and no grip strength weakness in June 2011 (*id.* (citing Ex. 7F/11)); had full external and internal rotation passively with pain only on the extremes of external and internal rotation actively in her right shoulder (*id.* (citing Ex. 7F/12)); and consistently reported progressing well or doing "great" (*id.* (citing Ex. 7F/1, 7F/3, 7F/5, 7F/7)).

The ALJ granted "little weight" to the state agency consultants to the extent that they

9

held that there was insufficient evidence regarding Plaintiff's physical condition during the relevant time frame. (Tr. 33, PAGEID #: 80; *see also* Tr. 71, PAGEID #: 118). However, the ALJ granted "partial weight" to the state agency consultants to the extent that their opinions reflected that Plaintiff "has no physical functional limitations and restrictions form the alleged onset date of disability through the date last insured." (*Id.*). In an effort to "extend[] the benefit of all reasonable doubt," however, the ALJ explained that he included an additional limitation regarding overhead reaching in Plaintiff's RFC. (Tr. 34, PAGEID #: 81).

The ALJ afforded Dr. Raya's May 2014 opinion "no weight." (*Id.*). The ALJ explained that Dr. Raya's opinions were "from almost a year and a half after the expiration of insured status, and there is no evidence they are or are intended as accurate representations of the claimant's physical functioning prior to then." (*Id.*). Further, the ALJ noted that this opinion was inconsistent with the totality of the evidence in the record. (Tr. 36, PAGEID #: 83). Finally, the ALJ explained that the final responsibility for determining if a claimant is "disabled" or "unable to work" is reserved for the Commissioner, not a physician. (Tr. 34, PAGEID #: 81).

The ALJ also noted that the "evidence strongly suggest[ed] that the claimant's impairments may not be the sole reason for her inability to sustain full-time competitive employment from the alleged onset date of disability through the date last insured. In light of the claimant's sporadic work history, I cannot reasonably infer that her unemployment . . . is due solely or even materially to medical impairments." (Tr. 37, PAGEID #: 84). Relying on the VE's testimony, the ALJ ultimately held that Plaintiff could perform her past work. (Tr. 38, PAGEID #: 85).

10

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III. DISCUSSION

In her Statement of Errors, Plaintiff alleges that the ALJ "reversibly erred in finding [her] capable of her past relevant work as a cook's helper, which requires 'constant' handling in addition to lifting and carrying of up to 50 pounds." (Doc. 12 at 6). In other words, Plaintiff argues that the ALJ's RFC is not supported by substantial evidence. Additionally, although not entirely clear, Plaintiff appears to be arguing that the ALJ erred when he gave little weight to Dr. Raya's opinion. (*Id.* at 7–9).

### A. Treating Physician

Turning first to the ALJ's rejection of Dr. Raya's opinion, two related rules govern how an ALJ is required to analyze a treating physician's opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating

11

physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted). However, "an ALJ may properly reject a treating physician's opinion that does not meet these standards." *Mixon v. Colvin*, 12 F. Supp. 3d 1052, 1063–64 (S.D. Ohio 2013) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529–31 (6th Cir. 1997)).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakley*, 581 F.3d at 406 (alterations in original)); 20 C.F.R. § 404.1527(c)(2). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

Here, the ALJ declined to give controlling weight to Dr. Raya's one sentence letter to the Social Security Administration that stated Plaintiff was disabled due to her hand and right shoulder deformity. As an initial matter, a conclusory statement that a plaintiff is disabled—an issue that is reserved for the Commissioner—is not "give[n] any special significance." *Robinson v. Comm'r of Soc. Sec.*, 180 F. Supp. 3d 497, 504 (S.D. Ohio 2016) (citing 20 C.F.R. § 416.927; *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Moreover, Dr. Raya

provided no explanation for his opinion, nor did he point to any evidence to support his ultimate conclusion that Plaintiff was disabled. Thus, the ALJ appropriately found that Dr. Raya's opinion was not consistent with the totality of the evidence and should not be afforded any weight. *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (holding that "the ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation") (citation and quotations omitted); *Grisier v. Comm'r of Soc. Sec.*, 721 F. App'x 473, 477 (6th Cir. 2018) (holding that medical "opinions are only accorded great weight when they are supported by sufficient clinical findings and are consistent with the evidence" ) (quoting *Cutlip*, 25 F.3d at 287).

Finally, the Sixth Circuit has made clear that medical source statements prepared after a plaintiff's insured status expired are "generally of little probative value." *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016), *reh'g denied* (Sept. 13, 2016) (citing *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004)). Dr. Raya's opinion from May 2014 was given a year and a half after Plaintiff's insured status expired, and Dr. Raya made no effort to explain whether his opinion related back to a period before Plaintiff's date last insured. The opinion thus has little probative value. *See Grisier*, 721 F. App'x at 47.

Accordingly, it was not an error for the ALJ to reject Dr. Raya's opinion, and he sufficiently articulated good reasons for his decision to do so.

### B. The ALJ's Formulation of the RFC

Plaintiff next argues that there was not "substantial evidence" to support the ALJ's defined RFC. (Doc. 12 at 9). Specifically, Plaintiff argues that the ALJ failed to consider post-DLI evidence even though it related to the time period before Plaintiff's DLI. (*Id.* at 6).

As the ALJ correctly explained, "[i]n order to qualify for DIB, a claimant must establish the onset of disability *prior* to the expiration or his [or her] insured status." *Kingery v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 598, 602 (S.D. Ohio 2015) (citation and quotations omitted) (emphasis in original). This means that "[e]vidence of disability obtained after the expiration of insured status is generally of little probative value." *Id.* (quoting *Strong*, 88 F. App'x at 845). To be relevant to the disability decision, evidence after the DLI "must relate back to the claimant's condition prior to the expiration of her date last insured." *Id.* (quoting *Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003)).

With this standard in mind, the undersigned finds that the ALJ properly focused his inquiry on the time period between Plaintiff's alleged onset date and DLI—February 1, 2012 through December 31, 2012. *See id.* However, because there was not a single medical record during that time frame, the ALJ looked to the records provided before the alleged onset date, in which Plaintiff consistently reported doing well (Tr. 263, 267, PAGEID #: 310, 314), stated that her shoulder pain was "well controlled" (Tr. 265, PAGEID #: 312), and reported that she had returned to her normal activities with little difficulty (Tr. 263, PAGEID #: 310). Further, her grip strength and range of motion in her elbows, hands, and wrists were noted to be normal. (Tr. 273–74, PAGEID #: 320–21). These records indicate that Plaintiff was more than capable of performing medium work. While Plaintiff did note that she had occasional soreness in her right shoulder and difficulty with overhead lifting (Tr. 264, PAGEID #: 312), the ALJ provided for limitations in his RFC to address these constraints. Thus, the RFC was supported by substantial evidence.

Even if the ALJ were to have considered evidence after Plaintiff's DLI, despite the fact that no medical provider stated that any functional limitations or disability "related back,"

substantial evidence from post-2012 still supports the RFC. Indeed, Dr. Kauffman's medical records from 2014 to 2016 indicate that Plaintiff had full range of motion and no pain in the elbows, wrists, and hands, and no detectable grip strength weakness. (Tr. 387, PAGEID #: 434). Further, although Plaintiff reported increased pain and discomfort in her right shoulder during this time frame, Plaintiff still cooked and cleaned (Tr. 385, PAGEID #: 432), she reported "doing significantly better" after re-starting treatment with Dr. Kauffman, rating her pain at only a 2 or 3 (Tr. 383, PAGEID #: 430), and stated her prescription strength Ibuprofen had "helped her quite a bit" (Tr. 377, PAGEID #: 424). This evidence supports the finding that Plaintiff could still perform medium work with the limitations opined in the RFC.

For these reasons, the ALJ's opined RFC was supported by substantial evidence. *See Kingery*, 142 F. Supp. at 604; *see also Hauck v. Comm'r of Soc. Sec.*, No. 2:16-CV-970, 2018 WL 1557248, at *3 (S.D. Ohio Mar. 30, 2018) (holding that even though "the medical records Plaintiff cites do reasonably indicate his condition may have worsened over time . . . they do not cast doubt on the ALJ's [RFC] determination" prior to the DLI).

## IV.  CONCLUSION

For the reasons stated, Plaintiff's Statement of Errors (Doc. 12) is **OVERRULED** and judgment shall be entered in favor of Defendant.

IT IS SO ORDERED.


Date:  June 11, 2018　　　　　　　　　　　　　/s/ Kimberly A. Jolson
　　　　　　　　　　　　　　　　　　　　　　KIMBERLY A. JOLSON
　　　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE